United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued November 13, 1997 Decided December 19, 1997 

 No. 96-7242

 Valerie Thomas, et al., 

 Appellees/Cross-Appellants

 v.

 National Football League Players Association, 

 Appellant/Cross-Appellee

 Consolidated with

 No. 96-7243

---------

 Appeals from the United States District Court 

 for the District of Columbia 

 (No. 91cv03332)

 Joseph A. Yablonski argued the cause for appellant/cross-
appellee, with whom Charles R. Both and Richard A. Berthel-
sen were on the briefs.


 David L. Rose argued the cause and filed the briefs for 
appellees/cross-appellants.

 Before: Edwards, Chief Judge, Ginsburg, Circuit Judge 
and Buckley, Senior Circuit Judge.

 Opinion for the Court filed by Chief Judge Edwards.

 Edwards, Chief Judge: A principal claim in this case is that 
the defendant, acting pursuant to "mixed motives," unlawfully 
retaliated against the plaintiffs in violation of Title VII, 42 
U.S.C. s 2000e et seq. (1994). The issues on appeal require 
us to delimit the requirements of McDonnell Douglas Corp. v. 
Green, 411 U.S. 792 (1973), Texas Dep't of Community Af-
fairs v. Burdine, 450 U.S. 248 (1981), and Price Waterhouse 
v. Hopkins, 490 U.S. 228 (1989), with respect to a plaintiff's 
prima facie case, a defendant's burden of production, and the 
ultimate burdens of persuasion, in a retaliation/mixed-motives 
case.

 The actions giving rise to this law suit occurred when 
Eugene Upshaw, Executive Director of the National Football 
League Players Association ("NFLPA"), first laid off, then 
terminated employees Valerie Thomas and Rita Raymond on 
the stated grounds that they had been disloyal in criticizing 
NFLPA staff and policies in an anonymously distributed 
document and in several legally taped telephone calls. Julie 
Taylor-Bland (Bland at the time of the events) resigned in 
the aftermath of the firing of the other two. Before leaving 
the employ of the NFLPA, Thomas and Bland had suggested, 
in conversations with management, that NFLPA promotion 
policy discriminated against African-American women. The 
three women subsequently sued the NFLPA, charging that 
the lay-off and discharge of Thomas and Raymond, and the 
alleged constructive discharge of Bland, came in retaliation to 
their opposition to discriminatory employment practices, and 
hence violated Title VII.

 After trial, the District Court granted judgment as a 
matter of law to the NFLPA on the plaintiffs' claim that 
there existed a pattern and practice of discrimination at the 
NFLPA. Joint Appendix ("J.A.") 902-09. It then found that 


Thomas had been unlawfully fired, that Raymond had not 
made out a prima facie case of retaliation, and that Bland 
had not been fired at all. The trial court granted Thomas 
back pay and prejudgment interest, but declined to reinstate 
her. Thomas, et al., v. National Football League Players 
Ass'n, No. 91-3332 (D.D.C. Jul. 24, 1996), reprinted in J.A. 
279. In a subsequent order, the District Court refused the 
NFLPA's request for costs, declaring Thomas the prevailing 
party. Thomas, et al., v. National Football League Players 
Ass'n, No. 91-3332 (D.D.C. Nov. 26, 1996), reprinted in J.A. 
326. The NFLPA now appeals the decisions adverse to it; 
Thomas, Raymond, and Bland cross-appeal the decisions ad-
verse to them.

 We affirm the District Court's judgment on the merits as to 
Thomas, Raymond, and Bland's claims. The District Court 
properly considered the evidence before it and correctly 
apportioned burdens of production and persuasion in this 
mixed-motives case. We reverse and remand the District 
Court's complete denial of the NFLPA's request for costs and 
remand the grant of prejudgment interest to Thomas. On 
remand, the District Court should apportion costs in line with 
the final disposition of the case; the trial court should also 
reconsider the grant of prejudgment interest for the period of 
delay during which the plaintiffs repeatedly amended their 
complaint. Finally, the District Court apparently erred in 
computing "fringe benefits" in connection with back pay 
awarded to Thomas; we therefore remand for reconsideration 
on this point.

 I. Background

 In 1988, Thomas, Raymond, and Bland worked for the 
NFLPA and belonged to Office and Professional Employees 
International Union, Local 2 ("Local 2"). After the NFLPA's 
unsuccessful strike against the owners during the 1987 sea-
son, the NFLPA's finances suffered, and NFLPA Executive 
Director Upshaw devised a new budget for the NFLPA which 
sought to reduce personnel costs through attrition. J.A. 281. 
The board of directors of the NFLPA met during the first 


week of March 1988, and elected George Martin president 
and Mike Davis vice president. The board declined to adopt 
Upshaw's proposed budget, instead demanding a ten percent 
reduction in personnel costs by lay-off. Id.

 After a banquet held in conjunction with the board meet-
ing, Martin convened an informal gathering in his hotel room 
that included Thomas and Bland. Thomas and others 
complained about promotional opportunities for African- 
Americans and women in the Local 2 bargaining unit. J.A. 
282. Some time after March 10, 1988, Martin organized a 
second meeting, which Thomas and Bland also attended. 
Similar concerns were raised, and someone present accused 
Upshaw of racism. Id.

 In the weeks that followed, Martin and Davis conducted 
personal and telephone interviews with staff on a range of 
employment-related subjects. Interviewees were assured of 
confidentiality. In their interviews, Thomas and Bland ex-
pressed views on race and sex discrimination at the NFLPA. 
Davis also interviewed Raymond. J.A. 283. Around the 
same time, Upshaw implemented the NFLPA board's di-
rective to lay off some employees to cut costs. Prior to the 
lay-offs, Upshaw heard from Davis that Thomas and Ray-
mond had criticized various employees in telephone conversa-
tions with Davis, and were suspected of producing and circu-
lating a document harshly critical of the NFLPA. The 
document was headed and referred to as "What every player 
should know about the NFLPA." It included, among other 
allegations, a variety of claims about unfair promotion prac-
tices at the NFLPA. J.A. 285-86. It did not include allega-
tions of racial discrimination.

 On March 18, 1988, Upshaw laid off six employees, among 
whom were Thomas and Raymond. When Thomas returned 
to her office after learning of the lay-offs, she discovered 
workers changing the locks on her door and shutting down 
her computer. J.A. 284. At a time proximate to the lay-offs, 
Martin undertook to investigate the employees' allegations of 
misconduct at the NFLPA, and asked Upshaw about minority 
issues at the NFLPA. Martin told Upshaw that Thomas had 


called him a racist and had complained about promotion of 
African-Americans and women. Id. Martin and Davis each 
gave copies of the "What every player should know" memo-
randum to Upshaw. Davis told Upshaw about his telephone 
conversations with Thomas and Raymond and that Raymond 
had mailed him a copy of the memorandum. Id.

 On March 23, 1988, Davis gave Upshaw tapes of his tele-
phone conversations with Thomas and Raymond. According 
to Upshaw's uncontradicted testimony, the conversations in-
cluded ad hominem attacks on various NFLPA employees, 
including Upshaw. On the tapes, Raymond promised to send 
a copy of the "What every player should know" memorandum 
to Davis. Upshaw concluded that Thomas and Raymond had 
written the memo.

 On April 12, 1988, five of the six employees laid off on 
March 18 were fired for cause. Upshaw sent each employee 
an identical letter explaining the firing on the grounds that 
the employees had libeled and slandered NFLPA personnel; 
had violated confidentiality; and had shown disloyalty to-
wards and intentionally embarrassed the NFLPA. J.A. 286. 
Upshaw later testified that he fired Thomas and Raymond for 
what he believed they had said and written about the NFLPA 
employees. Some weeks later, Bland asked Upshaw about a 
newly open paralegal/secretary position, and Upshaw told her 
that he "did not see her in the job"; on May 20, 1988, Bland 
resigned. J.A. 287.

 Local 2 pursued grievances against the NFLPA on behalf 
of Thomas and Raymond. The grievances were appealed to 
arbitration and an arbitrator ruled that the two had been 
dismissed without just cause. The arbitrator's award ordered 
reinstatement, Plaintiffs' Trial Exhibits ("P.X.") 77, but the 
NFLPA failed to comply. Thomas, Raymond, and Bland also 
filed timely charges with the Equal Employment Opportunity 
Commission ("EEOC"), which, after some delay, issued "no 
cause" determinations on all their claims. At trial, the Dis-
trict Court dismissed as a matter of law plaintiffs' claim of a 
pattern and practice of discrimination. J.A. 902-09. It found 
for Thomas and awarded her back pay, without reinstate-


ment, with prejudgment interest for twenty-one months after 
her firing, based on expert testimony that estimated the time 
it should have taken Thomas to find new employment. The 
District Court found against Raymond, who did not appear at 
trial. Finally, the District Court found that Bland had not 
been constructively discharged. The District Court declined 
to award costs to the NFLPA, determining that Thomas was 
the prevailing party.

 II. Analysis

 A.Burdens of Pleading, Production, and Persuasion Un-
 der Title VII

 Title VII makes it unlawful to retaliate against an employee 
who "has opposed any practice made an unlawful practice" by 
the statute. 42 U.S.C. s 2000e-3(a). The legal framework 
for analyzing retaliation claims under Title VII is as follows.

 As in all Title VII cases, the plaintiff must first make out a 
prima facie case of unlawful employment action. McDonnell 
Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Where 
retaliation is alleged, a prima facie case requires a showing 
that (1) plaintiff engaged in protected activity, (2) plaintiff 
was subjected to adverse action by the employer, and (3) 
there existed a causal link between the adverse action and the 
protected activity. Mitchell v. Baldridge, 759 F.2d 80, 86 
(D.C. Cir. 1985). A rebuttable presumption of unlawful dis-
crimination arises when a plaintiff makes out a prima facie 
case. Texas Dep't of Community Affairs v. Burdine, 450 
U.S. 248, 254 (1981). The defendant may rebut the presump-
tion by asserting a legitimate, non-discriminatory reason for 
its actions. The defendant's responsibility at this stage has 
been characterized as a "burden of production," because the 
ultimate burden of persuasion remains with the plaintiff. See 
id. at 255.

 When a defendant satisfies the burden of production, the 
presumption of discrimination dissolves; however, the plain-
tiff still has the opportunity to persuade the trier of fact that 
the defendant's proffered reason was not the actual or sole 


basis for the disputed action. The plaintiff may aim to prove 
that a discriminatory motive was the only basis for the 
employer's action, or the plaintiff may seek to show that the 
employer was motivated by both permissible and impermissi-
ble motives. The plaintiff often will--quite reasonably--
argue both alternatives. See Price Waterhouse v. Hopkins, 
490 U.S. 228, 247 n.12 (Brennan, J.) ("Nothing in this opinion 
should be taken to suggest that a case must be correctly 
labeled as either a 'pretext' case or a 'mixed-motives' case 
from the beginning in the District Court; indeed, we expect 
that plaintiffs often will allege, in the alternative, that their 
cases are both."). Where a plaintiff argues that discriminato-
ry motivation constituted the only basis for the employer's 
action, the plaintiff may persuade the trier of fact of the 
pretextual nature of the defendant's asserted reason "either 
directly by persuading the court that a discriminatory reason 
more likely motivated the employer or indirectly by showing 
that the employer's proffered explanation is unworthy of 
credence." Burdine, 450 U.S. at 256.

 Where, on the other hand, the plaintiff argues that the 
action resulted from mixed motives, a slightly different model 
operates. A plaintiff asserting mixed motives must persuade 
the trier of fact by a preponderance of the evidence that 
unlawful retaliation constituted a substantial factor in the 
defendant's action. Price Waterhouse, 490 U.S. at 276 
(O'Connor, J., concurring); id. at 259 (White, J., concurring). 
When the plaintiff successfully shows that an unlawful motive 
was a substantial factor in the employer's action, the defen-
dant may seek to prove in response that it would have taken 
the contested action even absent the discriminatory motive. 
See id. at 244-45 (Brennan, J.). If the defendant fails to 
persuade the trier of fact by a preponderance of the evidence 
that it would have taken the action even absent the discrimi-
natory motive, the plaintiff will prevail. See id. at 276 
(O'Connor, J., concurring).

 This burden on a defendant in a mixed-motives case has 
been characterized both as an affirmative defense, id. at 246 
(Brennan, J.) and as a shifting burden of persuasion, id. at 
274 (O'Connor, J., concurring). The question of characteriza-
tion is "semantic," and need not be definitively resolved. See 
id. at 259 (White, J., concurring). What is noteworthy, 


however, is that under Price Waterhouse a defendant who is 
guilty of acting pursuant to an unlawful motive may nonethe-
less escape liability by proving that it would have made the 
same decision in the absence of the unlawful motivation.1 In 
short, the ultimate burden of persuasion as to the facts 
constituting the defense properly falls on the defendant in a 
mixed-motives case, because the plaintiff has proven that 
unlawful motivation constituted a substantial factor in the 
defendant's action. "[W]here a plaintiff has made this type of 
strong showing of illicit motivation, the factfinder is entitled 
to presume that the employer's discriminatory animus made a 
difference to the outcome, absent proof to the contrary from 
the employer." Price Waterhouse, 490 U.S. at 276 (O'Con-
nor, J., concurring).

B. Appellant's Claims

 1. Meaning and Requirement of Direct Evidence

 Appellant NFLPA, the defendant below, argues that, under 
Price Waterhouse, the burden of persuasion shifts to the 
defendant only where the plaintiff has provided "direct" 
rather than "inferential" evidence of discriminatory animus. 
Brief for Appellant 26. We reject this contention. Under 
Price Waterhouse, the burden of persuasion shifts to the 
defendant when the plaintiff has shown by a preponderance of 
"any sufficiently probative direct or indirect evidence" that 
unlawful discrimination was a substantial factor in the em-
ployment decision. White v. Federal Express Corp., 939 F.2d 
157, 160 (4th Cir. 1991).

 Appellant's suggestion results from confusion that has aris-
en regarding the meaning of the word "direct" in Justice 
O'Connor's concurring opinion in Price Waterhouse, 490 U.S. 
at 275, 276, 277 (O'Connor, J., concurring). As an initial 
matter, it should be noted that Justice O'Connor's concur-
rence was one of six votes supporting the Court's judgment 

__________
 1 In 1991, Congress amended Title VII to provide that, in the 
situation where there is a finding of discriminatory motive and also 
a finding that the firing would have occurred even absent discrimi-
nation, the trial judge has discretion to grant some limited forms of 
relief: injunctive or declaratory relief, and attorney's fees, but not 
damages. 42 U.S.C. s 2000e-5(g)(2)(B).


(four Justices comprised the plurality, and Justice White filed 
a separate concurrence), so that it is far from clear that 
Justice O'Connor's opinion, in which no other Justice joined, 
should be taken as establishing binding precedent. Justice 
White's concurring opinion makes no mention of "direct" 
evidence, see 490 U.S. at 258-60, nor does the plurality 
opinion written by Justice Brennan. Furthermore, and more 
importantly, Justice O'Connor's opinion clearly indicates that 
the crucial prerequisite for burden-shifting is that the evi-
dence adequately establish that discriminatory motive played 
a "substantial" role in the employment decision. The opinion 
repeatedly describes the required impact of the discrimina-
tion as "substantial." See 490 U.S. at 271, 272, 274, 276, 277, 
278. Justice White, in his concurrence, also focuses on the 
substantial factor requirement. See id. at 259 ("As Justice 
O'Connor states, [plaintiff's] burden was to show that the 
unlawful motive was a substantial factor in the adverse 
employment action."). The emphasis of Justice O'Connor's 
opinion is on the substantial factor requirement, not on the 
distinction between types of evidence.

 In our view, Justice O'Connor's invocation of "direct" evi-
dence is not intended to disqualify circumstantial evidence 
nor to require that the evidence signify without inference. In 
context, the notion of "direct" evidence in Justice O'Connor's 
concurrence means only that the evidence marshaled in sup-
port of the substantiality of the discriminatory motive must 
actually relate to the question of discrimination in the partic-
ular employment decision, not to the mere existence of other, 
potentially unrelated, forms of discrimination in the work-
place. Indeed, Justice O'Connor relies on circumstantial 
evidence in Price Waterhouse to show that the employer's 
discriminatory motive played a substantial role in the disput-
ed employment decision. The decisionmakers who denied 
Ann Hopkins a partnership never admitted or stated express-
ly that the action was based on her gender. Rather, the 
Court cites gender-related, stereotyping evaluations and com-
ments made by some partners as suggesting to the factfinder 
that gender played a role in the denial. See 490 U.S. at 235-
37.

 In dicta in her concurrence, Justice O'Connor describes 
several pieces of evidence that, taken alone, would not show 


that discrimination had formed a substantial factor in the 
employment decision, including "stray remarks in the work-
place," statements by people who did not participate in the 
decisionmaking process, or expert testimony that an illegiti-
mate factor "play[ed] a role" in the decision. Id. at 277. In 
contrast to such evidence, Justice O'Connor says, "[w]hat is 
required is what Ann Hopkins showed here: direct evidence 
that decision makers placed substantial negative reliance on 
an illegitimate criterion in reaching their decision." Id. The 
word "direct" in this sentence simply distinguishes evidence 
that shows that an unlawful consideration constituted a sub-
stantial factor in the particular employment decision from 
evidence insufficiently related to the particular event.

 The "direct" evidence to which Justice O'Connor alludes 
certainly may be circumstantial in nature, so long as it 
establishes that discriminatory motive played a substantial 
role in the employment decision. See Griffiths v. CIGNA 
Corp., 988 F.2d 457, 470 (3rd Cir. 1993) (circumstantial evi-
dence may shift burden if it "directly reflect[s]" the alleged 
discriminatory attitude). Furthermore, such evidence--like 
all evidence short of outright admission of discriminatory 
motive--requires the factfinder to draw inferences. See Os-
trowski v. Atlantic Mut. Ins. Cos., 968 F.2d 171, 182 (2nd Cir. 
1992) (burden shifting requires "evidence of conduct or state-
ments by persons involved in the decisionmaking process that 
may be viewed as directly reflecting the alleged discriminato-
ry attitude, and that ... is sufficient to permit the factfinder 
to infer that the attitude was more likely than not a motivat-
ing factor in the employer's decision") (emphasis added); 
Radabaugh v. Zip Feed Mills, Inc., 997 F.2d 444, 449 (8th 
Cir. 1993) (quoting Ostrowski).

 As this court recently noted, "the distinction between direct 
and circumstantial evidence has no direct correlation with the 
strength of [a] plaintiff's case." Crawford-El v. Britton, 93 
F.3d 813, 818 (D.C. Cir. 1996) (en banc), cert. granted, 65 
U.S.L.W. 3817, 3825 (U.S. June 16, 1997) (No. 96-827). The 
purported distinction between "circumstantial" or "inferen-
tial" and "direct" evidence urged here does not make logical 
sense, because the decision to shift the burden of persuasion 
properly rests upon the strength of the plaintiff's evidence of 


discrimination, not the contingent methods by which that 
evidence is adduced. Such a distinction is incompatible with 
both the facts and the logic of Price Waterhouse.

 Burden-shifting under Price Waterhouse requires "evi-
dence of conduct or statements that both reflect directly the 
alleged discriminatory attitude and that bear directly on the 
contested employment decision." Fuller v. Phipps, 67 F.3d 
1137, 1142 (4th Cir. 1995). This formulation should be read 
carefully; evidence may "bear directly" on a decision without 
referring to it specifically. Nonetheless the quotation from 
Fuller correctly clarifies that "direct" describes a relationship 
between proof and incidents and not a characterization of the 
proof itself.

 A number of other circuits have concluded, correctly in our 
view, that there is no bar on using circumstantial or inferen-
tial evidence to shift the burden of persuasion under Price 
Waterhouse. See Griffiths, 988 F.2d at 470 (3rd Cir. 1993); 
Radabaugh, 997 F.2d at 449 (8th Cir. 1993); Ostrowski, 968 
F.2d at 182 (2nd Cir. 1992); White, 939 F.2d at 160 (4th Cir. 
1991). Some have understood "direct" evidence as a require-
ment of Price Waterhouse, and have remained silent as to the 
precise meaning of the term, never expressly construing it as 
the opposite of circumstantial or inferential evidence. See, 
e.g., Jackson v. Harvard Univ., 900 F.2d 464, 467 (1st Cir. 
1990); Gagn v. Northwestern Nat'l Ins. Co., 881 F.2d 309, 
315 (6th Cir. 1989). Several circuits have both taken Justice 
O'Connor's concurrence as the rule of Price Waterhouse and 
have interpreted "direct" to mean non-inferential or non-
circumstantial. See, e.g., Brown v. East Mississippi Elec. 
Power Ass'n, 989 F.2d 858, 861 (5th Cir. 1993); Heim v. 
Utah, 8 F.3d 1541, 1547 (10th Cir. 1993); EEOC v. Alton 
Packaging Corp., 901 F.2d 920, 923 (11th Cir. 1990). For the 
reasons set forth above, we believe that the few circuits that 
have taken Justice O'Connor's use of the word "direct" to 
mean non-inferential or non-circumstantial have misread her 
concurring opinion and misconstrued the rule of law to be 
drawn from Price Waterhouse.


 2. Defendants Notice of the Shifting Burden of Persua-
 sion

 The NFLPA next argues that a defendant must somehow 
receive "notice" before the District Court that the burden of 
persuasion has shifted to it under the mixed-motives model of 
the case. Appellant's claim depends on a mistakenly formal-
istic conception of the order and allocation of proof in Title 
VII cases. It is true that a written synthesis of the case law 
describing tests and burdens for assessing a Title VII retalia-
tion claim gives the appearance of an algorithm. The law has 
developed in this way for good reason: when a district court 
articulates its reasoning in a Title VII case, it benefits from 
conscientiously completing the analytic steps required by the 
Supreme Court. The steps of the analysis aim to assure 
compliance with the law and uniformity in its application. 
This is not to say, however, that the case law aims to stifle 
the parties in the course of litigation. It is quite the con-
trary.

 Pleadings in the alternative, vagaries of evidence, and the 
general disorderliness of testimonial narrative all ensure that 
various elements of proof do not present themselves to the 
trial court in a regimented fashion. For this reason, the Title 
VII algorithm need only govern the trial court's assessment 
of the evidence, not the precise order in which that evidence 
is presented. What the Supreme Court has said of the prima 
facie case approach of McDonnell Douglas applies as force-
fully to the entire Title VII framework: it was "never intend-
ed to be rigid, mechanized, or ritualistic. Rather, it is merely 
a sensible, orderly way to evaluate the evidence in light of 
common experience as it bears on the critical question of 
discrimination." Furnco Constr. Corp. v. Waters, 438 U.S. 
567, 577 (1978). The Title VII algorithm was designed to 
clarify the question of whether discrimination occurred, not 
"to make [courts'] inquiry even more difficult." United 
States Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 
716 (1983). Thus, it is ridiculous to suggest, as the NFLPA 
does here, that a trial court must give some kind of "notice" 
to a defendant during the course of a trial as soon as it 
appears that the burden of persuasion has shifted. Profes-


sional football games may be played in clearly defined "quar-
ters," but we do not litigate Title VII claims in this way.

 Furthermore, the argument that a defendant might some-
how suffer prejudice absent notice of burden-shifting makes 
little sense in light of the normal progress of Title VII 
litigation. If a defendant has evidence tending to show that it 
would have discharged the plaintiff notwithstanding any dis-
criminatory motive, it would be foolish not to introduce this 
evidence under its Burdine burden of production to rebut the 
prima facie case of discrimination. The defendant would 
introduce this evidence regardless of whether the case fell 
under the Burdine rubric of single reason or the Price 
Waterhouse rubric of mixed motives. Where the factfinder 
concludes that the employer's decision resulted from mixed 
motives, it will consider the self-same exculpatory evidence as 
a proffered refutation of the argument that discrimination 
constituted a substantial factor in the employment decision. 
As a result, the parties will normally litigate the defendant's 
claim fully, as indeed occurred in the case before us. Accord-
ingly, we conclude that no formal notice of burden-shifting is 
required under Price Waterhouse.

C. District Court Decision on the Merits

 The District Court in the case at bar correctly followed the 
Title VII algorithm in assessing the evidence before it. It 
found that Thomas engaged in protected activity by partici-
pating in two conversations with Martin in which she raised 
the issue of discrimination against women and African- 
Americans in promotion at the NFLPA, and by distributing 
the memo to Martin. J.A. 289-90. The District Court found 
that the NFLPA fired Thomas "immediately following" the 
protected activity, and permissibly concluded that Thomas 
had made out a prima facie case. Because it did not find 
evidence that Raymond engaged in protected conduct, the 
District Court correctly found that Raymond had not made 
out a prima facie case. J.A. 291-92. The District Court 
further found that Bland was not constructively discharged, 
because she had not presented evidence of aggravating fac-
tors making her work intolerable. J.A. 292-93; see Dashnaw 


v. Pena, 12 F. 3d 1112, 1115 (D.C. Cir. 1994). Neither of 
these conclusions was clearly erroneous; the legal framework 
for both was correct.

 The District Court then assessed the evidence that served 
to refute the NFLPA's claim that it had non-discriminatory 
reasons sufficient to fire Thomas. It found that the way in 
which the firing followed Upshaw's learning of Thomas's 
taped comments; the unusual security measures surrounding 
the firing; and Upshaw's possession of the memorandum 
which he believed Thomas had co-authored sufficed to prove 
that Thomas's firing was motivated "in substantial measure" 
by her protected activity. J.A. 291. This constituted an 
acceptable finding of mixed motives, and was not clearly 
erroneous. Although the District Court did not cite Price 
Waterhouse, it correctly concluded that the burden of persua-
sion had shifted, and that as a result "it was NFLPA's burden 
to demonstrate that Thomas would have been discharged 
regardless of her protected activity." Id. In the District 
Court's view, "the NFLPA failed to sustain that burden" in 
that it did not successfully separate permissible from imper-
missible motives in its decision. Id. This conclusion was not 
clearly erroneous, either, but reflected the factfinder's assess-
ment of the evidence surrounding the firing.

 Appellant urges that even if the burden did shift to it, it 
established adequately that it would have fired Thomas re-
gardless of her protected actions, because it fired other 
employees who did not engage in protected activity. This 
argument, which the NFLPA calls a "syllogism," Brief for 
Appellant 30, is thoroughly defective. It is a non sequitur to 
argue that if an employer fires several employees with legal 
motivation, all other firings that occur simultaneously also 
acquire the color of legality. The NFLPA could have retali-
ated against Thomas for protected activity, and then fired 
other employees at the same time either to mask its retalia-
tion or in a corporate fit of pique.

D. Rejection of Statistical Evidence

 The District Court correctly ruled as a matter of law that 
plaintiffs did not make out a prima facie statistical case of a 


pattern and practice of discrimination on the part of the 
NFLPA. The crucial basis for this ruling was that plaintiffs' 
expert did not consider the relevant qualifications of those 
passed over or approved for promotion. J.A. 906-07. A 
prima facie case of statistical disparity must include the 
minimum objective qualifications of the applicants. Palmer v. 
Schultz, 815 F.2d 84, 91 n.6 (D.C. Cir. 1987); Segar v. Smith, 
738 F.2d 1249, 1274 (D.C. Cir. 1984). Here, the expert did 
not account for minimum qualifications. Indeed, he could not 
have done so, because Appellees never specifically requested 
qualification standards from Appellant in discovery. We need 
not reach the District Court's other reasons for dismissal, 
because even if the trial court had found adequate sample size 
and statistical significance (which it did not, J.A. 906-07), a 
non-discriminatory, qualifications-based reason for the dispa-
rate impact could have existed. The District Court properly 
dismissed the statistical case as insufficient as a matter of 
law.

E. The Relief

 The District Court awarded Thomas back pay from the 
date of her firing to December 1989, by which time, it found, 
she should have secured employment. J.A. 294-97. The 
District Court did not abuse its discretion in weighing expert 
testimony regarding job availability to arrive at this time 
period.

 In computing the award on reconsideration, the District 
Court used a form prepared by plaintiffs' expert, labeled 
Attachment C3, which computed fringe benefits for 1988 and 
1989 as $6,173 and $8,305 respectively. J.A. 310. However, 
in his testimony, the expert certified a different version of 
this form, labeled Attachment C1, Version 3, J.A. 313, P.X. 
375, as accurate and as the basis for his estimates. See J.A. 
689-90, 752. This second form gives fringe benefits for 1988 
and 1989 as $2,685 and $3,767. The District Court apparently 
erred by using the wrong document in its damage computa-
tion; we remand for correct computation of damages or for 
explanation.


 The District Court did not abuse its discretion in declining 
to reinstate Thomas. Although the acrimony of litigation 
alone probably would not suffice to rule out reinstatement, 
see Dickerson v. Deluxe Check Printers, Inc., 703 F.2d 276, 
281 (8th Cir. 1983), the District Court's denial of reinstate-
ment reflected its own observation that some of Thomas's 
actions "might well have warranted discharge." J.A. 291. 
The District Court reasonably concluded that reinstatement 
would not serve the interests of justice where the employee 
engaged in behavior that could conceivably have given rise to 
a legitimate discharge under other circumstances.

 The District Court awarded Thomas prejudgment interest 
on the back pay. The presumption strongly favors prejudg-
ment interest, Barbour v. Merrill, 48 F.3d 1270, 1278-79 
(D.C. Cir. 1995), but the trial court may disallow interest 
where attributable to substantial, unexplained delay by the 
plaintiff. See Williamson v. Handy Button Mach. Co., 817 
F.2d 1290, 1298 (7th Cir. 1987). Although Thomas reasonably 
awaited the EEOC's disposition of her request for a right to 
sue letter, which was delayed through no fault of her own, the 
same cannot be said of the three-year period during which 
Thomas and her co-plaintiffs repeatedly amended their com-
plaint. The District Court must reconsider this issue on 
remand.

F. Costs

 The District Court abused its discretion in finding Thomas 
alone to be the prevailing party and, therefore, declining to 
award any costs to the NFLPA. J.A. 326. In determining 
the prevailing party in mixed-outcome cases, the case must be 
"viewed as a whole." Fogelman v. ARAMCO, 920 F.2d 278, 
285 (5th Cir. 1991). Although the NFLPA did violate Title 
VII with regard to Thomas, the NFLPA prevailed on twenty-
four of the twenty-six counts before the trial court, including 
eight of the ten counts relating to Thomas. While statistical 
precision is not necessary in determining the prevailing party, 
the District Court should have apportioned costs in a manner 
that, at least approximately, reflected the success of the 


NFLPA on the great majority of the claims brought against 
it. See Quaker Action Group v. Andrus, 559 F.2d 716, 719 
(D.C. Cir. 1977) (apportioning appeal costs by percentage and 
"contemplat[ing]" similar action by trial court).

 III. Conclusion

 For the foregoing reasons, the judgment of the District 
Court is affirmed regarding Thomas, Raymond, and Bland. 
The judgment is reversed and the case remanded on the 
questions of computation of damages, apportionment of costs, 
and granting of prejudgment interest.

So ordered.